IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

LUFKIN DIVISION

| | | |
|---|---|---|
| VICENTE GUZMAN, #1541295 | § | |
| VS. | § | CIVIL ACTION NO. 9:10cv111 |
| JANIE COCKRELL, ET AL. | § | |

MEMORANDUM OPINION AND ORDER

Plaintiff Vicente Guzman ("Guzman" or "Plaintiff"), previously an inmate confined in the

Byrd Unit of the Texas prison system, proceeding *pro se* and *in forma pauperis*, filed the above-

styled and numbered civil rights lawsuit under 42 U.S.C. § 1983. Though he was confined in the

Byrd Unit at the time he filed his lawsuit, and has since been released, the events of this lawsuit took

place at the Duncan Unit. The complaint was transferred to the undersigned with the consent of the

parties pursuant to 28 U.S.C. § 636(c).

I.     **BACKGROUND**

The original complaint was filed on August 23, 2010. On March 15, 2011, the Court

conducted an evidentiary hearing, in accordance with *Spears v. McCotter*, 766 F.2d 179 (5th Cir.

1985), to consider the Plaintiff's claims. The hearing was conducted "to dig beneath the conclusional

allegations; to reduce the level of abstraction upon which the claims rest; to ascertain exactly what

scenario the prisoner claims occurred, as well as the legal basis for the claim." *Id.* at 180. The

hearing is "in the nature of a motion for more definite statement." *Id.* at 180-181. The Plaintiff

testified as to the factual basis of his claims. Regional Grievance Office representative Phillip

1

Brooks and Warden Dwayne Dewberry testified under oath about prison policies and information contained in the Plaintiff's prison records. Nurse Carrie Hucklebridge testified as to the contents of Plaintiff's medical records.

Plaintiff claims that he is a geriatric inmate, over age 55. He asserts that when he was previously housed at the Duncan Unit, instead of being assigned to a bottom bunk he alleges to be consistent with his age, he was assigned to a top bunk. None of the upper bunks at the Duncan Unit were equipped with a ladder or an assistive device to get into the bed. He testified that on May 14, 2010, he was forced to climb onto the top bunk in his cell and, with no ladder to assist him, he fell back down to the floor, fracturing his ribs and collar bone.

He testified that while trying to get treatment, Plaintiff found that there is no medical staff on hand at the Duncan Unit between 6:00 pm and 6:00 am. Another prisoner called for help and Plaintiff was escorted to the Sergeant's Desk. Plaintiff further testified that Defendant Sgt Primrose took Plaintiff to the Supervisor's Office where Plaintiff explained his injury and took his shirt off. Sgt Primrose saw Plaintiff's swelling and that he was in pain, but told him that he could do nothing because there were no medical personnel on staff after 6:00 pm. He told Plaintiff to return to his bunk and that he would leave a message for Plaintiff to be called out for medical examination in the morning.

The next morning, Plaintiff was called to the Sergeant's Desk and explained what happened to Lt McKnight. Lt McKnight saw his shoulder popped out and took Plaintiff to the Duncan Unit Infirmary. There, Plaintiff was examined by LVN Rebecca Armstrong, who then gave him Ibuprofen and made arrangements for Plaintiff to go to Woodland Heights Memorial Hospital in Lufkin, Texas.

At the hospital, Plaintiff was seen by Dr. Malhi, who examined him and ordered X-rays and a CAT scan, while he was given a pill and a shot for the pain. By noon, Dr. Malhi re-examined Plaintiff and determined he had fractured his collar bone and two ribs. Dr. Malhi ordered a strap for his arm and prescribed an undefined pain medication. That afternoon, Plaintiff was returned to the Duncan Unit.

Plaintiff testified further that in 1980, before he was incarcerated, he had a motorcycle accident in which his leg suffered a compound fracture and was nearly amputated. It still swells up and hurts in winter. On November 16, 2008, he was sent to the Texas Department of Criminal Justice, Correctional Institutions Division. He was in another unit originally and had been for over a year when he was transferred to the Duncan Unit. Other units he had seen had ladders to the top bunks, including the Middleton Unit and the Ware Unit. At the Duncan Unit, however, no bottom bunk was available for him and the top bunks had no ladders. The doctor assigned to the Unit would not give him medical relief for a bottom bunk. He filed a Step 1 grievance on March 22, 2010, number 2010121909, stating these facts and asserting that he was afraid to use the top bunk because of no assistive device and the need to jump down from the bunk with his bad leg. This grievance predated Plaintiff's injury. However, the response to his grievance was that there was no medical indication for assignment to a bottom bunk and no medical indication for security to weld ladders or suggest step ladders or any boxes to get into the top bunk.[1]

Following the *Spears* hearing, the Court issued a Memorandum Opinion and Order of Partial

---

[1] Although he described this response in his testimony at the *Spears* hearing, the copy of this grievance Plaintiff submitted with his Motion for Summary Judgment, described below, does not refer to "no medical indication for security to weld ladders" at all; in fact, the copy he submitted has no response on it.

Dismissal dismissing Defendants Cockerell, McMullin, Self, White and Unknown Lieutenant but permitting Plaintiff to proceed with his claim of deliberate indifference against Defendants Primrose, Tobias and Smith.

Two days apart, Defendants and Plaintiff each filed cross motions for summary judgment. First, Defendants Primrose, Smith and Tobias filed their Motion for Summary Judgment (docket entry #60) (DMSJ) asserting that (1) Eleventh Amendment immunity bars claims against them in their official capacities; (2) Defendant Primrose was not deliberately indifferent to Plaintiff's serious medical needs; (3) Defendants Smith and Tobias were not deliberately indifferent to Plaintiff's serious medical needs or safety; and (4) all Defendants are entitled to qualified immunity to Plaintiff's claims against them in their individual capacities. Two days later, Plaintiff filed his Motion for Summary Judgment (PMSJ) (docket entries #65-68). In it, he argues that Defendant Primrose was deliberately indifferent to his medical needs the evening of May 14, 2010, when Plaintiff fell out of his top bunk and injured himself and that Defendants Tobias and Smith had been deliberately indifferent on the basis of failure to provide adequate medical services for geriatric inmates and failure to train the security staff such as Defendant Primrose. To the extent that he addresses issues raised by the Defendants, he does so by reference to their Answer (docket entry #32). A month later, Plaintiff also filed a Response in Opposition to Defendants' MSJ (docket entry #75), but it does not address more in scope than his own PMSJ.

## II.    STANDARD ON SUMMARY JUDGMENT

Rule 56(a), Fed. R. Civ. P., provides that the Court may only grant a motion for summary judgment when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *VRV Development L.P. v. Mid-Continent Cas. Co.*, 630 F.3d 451, 455

(5th Cir. 2011) (quoting Fed.R.Civ.P. 56(a)). The party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine dispute as to a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986). The moving party, however, "need not negate the elements of the nonmovant's case." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). The movant's burden is only to point out the absence of evidence supporting the nonmoving party's case. *Stults v. Conco, Inc.*, 76 F.3d 651, 655 (5th Cir. 1996). Once the moving party makes a properly supported motion for summary judgment, the nonmoving party must look beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial. *Id*. Neither "conclusory allegations" nor "unsubstantiated assertions" will satisfy the nonmovant's burden. *Id*.

Summary judgment is inappropriate if the evidence before the court, viewed as a whole, could lead to different factual findings and conclusions. *Honore v. Douglas*, 833 F.2d 565 (5th Cir. 1987). The district court must look to the full record, including the pleadings, affidavits, and depositions. *Williams v. Adams*, 836 F.2d 958, 961 (5th Cir. 1988). Under this standard, fact questions are considered with deference to the nonmovant. *Reid v. State Farm Mutual Automobile Insurance Co.*, 784 F.2d 577, 578 (5th Cir. 1986). The evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L. Ed. 2d 202 (1986). The court resolves factual controversies for purposes of summary judgment in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts. *Little*, 37 F.3d

at 1075.  The court does not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts.  *Wallace v. Texas Tech University*, 80 F.3d 1042, 1048 (5th Cir. 1996) (citing *Little*, 37 F.3d at 1075).

"The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48.  An issue is "genuine" if the evidence supporting its resolution in favor of the party opposing summary judgment, together with any inference in such party's favor that the evidence allows, would be sufficient to support a verdict in favor of the party.  *St. Amant v. Benoit*, 806 F.2d 1294, 1297 (5th Cir. 1987).  A "material fact" is one that might affect the outcome of the suit under governing law.  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.  "When the moving party has carried its burden under Rule 56(c),[2] its opponent must do more than simply show that there is some metaphysical doubt as to the material facts ... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (footnote omitted).

Furthermore, in that this is a civil rights claim pursuant to 42 U.S.C. § 1983, "To invoke the jurisdiction of a federal court, a litigant must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision."  *Lemons v. Swann*, 412 Fed. Appx. 672, 673 (5th Cir. 2011) (per curiam) (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477, 110 S. Ct. 1249, 108 L. Ed. 2d 400 (1990)).

---

[2]       The predecessor to the current Rule 56(a).

## III.     DISCUSSION AND ANALYSIS

Defendants' DMSJ is more structured than Plaintiff's PMSJ and was filed first; therefore, the Court will use its structure to address the parties' cross-arguments. Both summary judgment motions are supported by affidavit and documentary evidence. *See* DMSJ at Exs. A through L (including affidavits by all three Defendants along with authenticating business record affidavits); PMSJ at docket entry #68 (Plaintiff's Declaration in Support with Exs. 1-20).

### A.     Eleventh Amendment Immunity

Defendants first assume that they are being sued in both their individual and official capacities. *See* DMSJ at 6 ("It is assumed that Plaintiff brings his suit against the Defendants in both their official and individual capacities."). They assert that any claims against them in their official capacities are barred by Eleventh Amendment Immunity. *See id*. at 6-7, citing *Pennhurst State School and Hosp. v. Halderman*, 465 U.S. 89, 100, 104 S. Ct. 900, 79 L. Ed. 2d 67 (1984); *Warnock v. Pecos County, Texas*, 88 F.3d 341, 343 (5th Cir. 1996).

The Eleventh Amendment bars claims against a state brought pursuant to 42 U.S.C. § 1983. *Aguilar v. Texas Dept. of Criminal Justice*, 160 F.3d 1052, 1054 (5th Cir. 1998). In *Will v. Michigan Department of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989), the Supreme Court held that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." The Supreme Court therefore upheld the dismissal of the Michigan Department of State Police and its Director sued in his official capacity. *Id*. The Fifth Circuit has accordingly "held that the Eleventh Amendment bars recovering § 1983 money damages from TDCJ officers in their official capacity." *Oliver v. Scott*, 276 F.3d 736, 742 (5th Cir. 2002). To the extent that Plaintiff is suing the Defendants in this case for money damages, *see* Complaint at 5, he may not recover on the

basis of Defendants' official capacities.

Plaintiff does not state in his complaint whether he is suing Defendants in their official, individual or both capacities and does not address the issue in his PMSJ. However, in his Opposition to the DMSJ, he does state that he is suing these Defendants in their individual capacities only and does not argue the issue of official capacity. He therefore concedes the point and no genuine issue exists. Summary judgment will be granted Defendants on the issue of Eleventh Amendment immunity in their official capacities only.

### B.     Deliberate Indifference Claims

Plaintiff raises deliberate indifference to medical needs claims against all three Defendants, though in somewhat different postures. The Court will first examine the claims in turn.

To state a claim under the Eighth Amendment for denial of medical care, a Plaintiff must allege acts or omissions "sufficiently harmful to evidence a deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976); *Norton v. Dimanzana*, 122 F.3d 286, 291 (5th Cir. 1997). "Deliberate indifference encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of mankind." *Norton*, 122 F.3d at 291. It occurs when two requirements are met. "First, the deprivation alleged must be, objectively, sufficiently serious; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994) (internal citations and quotations omitted). Second, the prison official must subjectively know of and disregard a substantial risk to the inmate's health or safety. *Id*. at 839-40.

In this light, deliberate indifference is "an extremely high standard to meet," and requires a

showing that prison officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Domino v. TDCJ-ID*, 239 F.3d 752, 756 (5th Cir. 2001).

### 1.    Defendant Primrose

The fundamental issue with regard to Defendant Sgt. Primrose is whether he was deliberately indifferent to Plaintiff's serious medical needs as the sergeant on duty the evening of May 14, 2010, after Plaintiff fell from his bunk and injured himself. In this light, the essential dispute between the parties is whether Plaintiff ever reported his injury to Sgt. Primrose and whether Sgt. Primrose's delay in obtaining medical services for Plaintiff resulted in "substantial harm" so as to constitute deliberate indifference.

Plaintiff and Sgt. Primrose have filed sworn statements as to what transpired the evening of May 14, 2010. First, Plaintiff made an unsworn declaration attached to his complaint as an exhibit; then made a sworn declaration "under penalty of perjury" restating his version of the facts and incorporating by reference his original declaration. In his complaint, he stated:

> What happened was when I started to climb up, because there is no ladder, I had to jump, but because there is no foot hole or place to secure my foot (as is required for geriatric beds), my foot slipped as I held on to the gusset that attaches to the wall and to the bunk [ ], I fell back toward the floor, and I knew I was seriously injured. My cellmate, Hollingsworth (bunk #18) notified the floor officer, who came and escorted me to the Sergeant's Desk, where Sergeant Primrose asked me to follow him into the Supervisor's Office. I explained how I got injured, Sgt. Primrose asked me to take my shirt off and he notices swelling and that I was in severe pain, he said that he knew that it was discomforting and stated "I can do nothing because there is nobody in medical or on duty for medical after 6 pm." Sgt. Primrose said that he would make a note for medical to call me out in the morning and told me to go back to my bunk. I stayed in my bunk, with inmates helping me off and on the bunk [ ]. I remained in my bunk until 4 am, went to breakfast and came back ans was helped back onto my bunk and stayed until 7:00 am on May 15, 2010, when I was called to Sergeant's Desk and Lieutenant McKnight asked me what happened and I explained. Lt. McKnight asked me if I was making my shoulder pop out like that and I answered "No, that's the way it stayed (ever since

the fall last night),["] he immediately took me to Duncan Infirmary.  In the infirmary, I was examined by LVN Rebecca Armstrong [ ] and she did a personal examination, took vitals and gave me (4) 200 mg ibuprofen and then made some phone calls, she informed Lt. McKnight  that I needed to go to Woodland Hospital, Lufkin, TX.  This was about 9 am Saturday May 15, 2010.

See Complaint at PageID #9-10; see also Plaintiff's Declaration in Support of PMSJ at ¶¶ 7-8 (summarizing above statement and incorporating it by reference).  Plaintiff also described the medical care and diagnoses he received while at the Woodland Hospital; it is undisputed that he was diagnosed with a broken clavicle and two broken ribs, and received straps/braces in treatment.

At odds with Plaintiff's statement, Defendant Sgt. Primrose stated in his affidavit that Plaintiff did not complain to him of an injury that night:

> Mr. Guzman alleges that on May 14, 2010, he came to me after he was injured, that he complained of injury, that I then examined him and did not summons medical staff for his injury.  However, I did not receive a complaint from Mr. Guzman on May 14, 2010, concerning an injury.  I was the only Sergeant on the unit on the night of May 14, 2010; therefore, had Mr. Guzman made a complaint of an injury from slipping from his bunk I would have made a written notation and report of the incident.  I had no personal involvement with Mr. Guzman and the alleged incident.

> If Mr. Guzman had complained to me of an injury I would have escorted him to medical to be examined through Digital Medical Services (DMS).  DMS is where offenders may be seen by medical staff after hours through a video conference system set up with the Polunsky Unit.  After the offender is seen by medical staff through DMS, the medical staff makes the determination whether the offender needs immediate medical care o[r] if the offender may be seen the following day by an onsite medical staff personnel.  In the event of emergencies, such as an unresponsive or severely bleeding offender, I have the duty to call 911 immediately and ensure that the offender gets Emergency Medical Services (EMS).

> I was not involved with the incident pertaining to Mr. Guzman and this lawsuit.  Mr. Guzman never made any complaints of injury to me on the night of May 14, 2010.  Whenever there is an accident that occurs on the unit the person who the offender complains to is the officer who writes the accident report.  I did not write an accident report for this incident because Mr. Guzman did not complain to me about this incident.  I had no personal involvement with this incident and I was never made aware of any injury to Mr. Guzman.  At no time was I aware of a substantial risk to Mr. Guzman's health or safety and disregard the risk.

At no time did I act deliberately indifferent to Mr. Guzman's serious medical needs or safety. I have no personal involvement pertaining to the availability of medical assistance on the Duncan Unit nor did I refuse to summons medical assistance for Mr. Guzman. At all times relevant to this suit, I performed all my duties as a Sergeant to the best of my abilities and with the good faith belief that my actions were reasonable and in accordance with the law.

*See* DMSJ Ex. D at 2-3.

Defendants argue that Sgt. Primrose's affidavit demonstrates that Plaintiff never complained to him about his injuries. If the analysis had to rest on that point, the two sworn statements quoted above, as contrary as they are, would create a genuine issue of fact requiring trial before a fact-finder.

However, more central to the analysis, even if Plaintiff did speak with Sgt. Primrose the evening of May 14, 2010, he did not present a "medical emergency." That is not to say that Plaintiff was not injured; it is undisputed that he was. However, taking the allegations in Plaintiff's complaint as true, he presented as an ambulatory inmate complaining of pain but not bleeding excessively (or at all), not having trouble breathing, not experiencing dizziness or having blacked out or showing any the indicia requiring "immediate access to health services" under TDCJ's Access to Health Services policy, AD-06.07. *See* DMSJ Ex. G at ¶ IV.B. Defendants also cite Plaintiff's medical records, DMSJ Ex. A at 1-13. Certainly, those medical records show that ultimately Plaintiff's injury was not a life-threatening event. So does the report of Defendants' medical expert, Steven Bowers, M.D. *See* DMSJ Ex.C at 2-3.

On this presentation, it is not obvious that a delay could have been any type of serious deprivation of medical needs. *Farmer*, 511 U.S. at 834. Additionally, Sgt. Primrose states that had he observed subjectively a need to provide immediate medical care, he would have taken Plaintiff for examination through Digital Medical Services (DMS). *See* Primrose Aff., DMSJ Ex. D at 2. However, even if Plaintiff did present to Sgt. Primrose that evening, the sergeant did not see or was

not aware of a subjective risk to Plaintiff's safety. *Farmer*, 511 U.S. at 839-40; *see also* DMSJ Ex. C at 3 ("Since Mr. Guzman's clavicle fracture was nondisplaced, it was probably not apparent to security personnel that Mr. Guzman had sustain[ed] a fracture of any kind.").

Plaintiff objects that at that point, it was unknown whether he had internal injuries such as, for example, a punctured lung by a broken rib. Therefore, he argues, the delay of about 12 hours in his examination by qualified medical personnel could have placed him at risk. The fact is that it did not actually do so. Moreover, a "delay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference, which results in substantial harm." *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993). In this case, the delay did not result in substantial harm; that occurred when Plaintiff fell off his bunk. No additional substantial harm accrued due to the delay. Even to the extent that Plaintiff suffered some pain while awaiting medical examination the next morning, delays in treatment that do not cause lasting complications do not constitute deliberate indifference. *See McGiffin v. Clayton*, 2009 WL 577721, at *1 (5th Cir. Mar. 6, 2009) (per curiam); *Parker v. Doty*, 2009 WL 804098, at *2 (N.D. Tex. Mar. 25, 2009) (increased back pain caused by delay in receiving medication does not constitute substantial harm); *James v. UTMB Medical Center*, 2010 WL 3429583, at *4 (E.D. Tex. Aug. 27, 2010) (delay in providing pain medication without substantial harm is not deliberate indifference).

On this basis, no genuine dispute as to any material fact, Fed. R. Civ. P. 56(a); *VRV Development L.P.*, 630 F.3d at 455, and Defendant Primrose is entitled to a grant of summary judgment in his favor.

### 2.      Defendants Tobias And Smith

Plaintiff's allegations place Defendants Tobias and Smith in somewhat similar positions, and

the Court will address them together. Plaintiff alleges that Alternate Unit Safety Officer Judy Tobias and Operations Review Sergeant Chris Smith were aware that there was no 24-hour medical care at the Duncan Unit, which he further alleges housed a large number of older inmates. *See* Pltf Declaration in Support of PMSJ at 4, ¶ 27-28. He contends that they should have ensured that in case of an emergency, medical care would be provided without delay and that the security staff would be properly trained to handle such emergencies. *Id*. He further asserts that Defendant Tobias knew that the bunks were unsafe for older offenders. *Id*. at 4, ¶ 29.

As to Defendant Smith, Defendants submit his affidavit and excerpts from TDCJ's Post Order - Operational Review Sergeant (PO-07.107) (DMSJ Ex. H); Executive Directive - Operational Review Program (ED-02.92) (DMSJ Ex. I); and Security Memorandum - Unit Level Operational Review Program (SM-01.23) (DMSJ Ex. J) in support of their argument that he is not responsible for medical personnel assignments or shifts at the Duncan Unit. As Defendant Smith states in his affidavit, his duty is "to conduct operational reviews of functional areas at the unit level" . . . "ensuring that each department (such as food, laundry, and commissary) within the unit is operating according to TDCJ policy." *See* Smith Aff., DMSJ Ex. F at 2. In that capacity, Defendant Smith is "not in charge nor do I have control over the medical staff onsite availability" at the Duncan Unit. *Id*. He states that his job responsibility "is to ensure that the security aspect of the Duncan Unit is operating according to TDCJ policies and procedures; thus, I am not responsible for medical staff and medical care." *Id*. He asserts that changing onsite medical staff availability to 24 hours at the Duncan Unit is the responsibility of the University of Texas Medical Board (UTMB) Administration in Galveston, Texas. *Id*.

Complementing Defendant Smith's affidavit statement, an examination of the DMSJ Exs.

H, I and J reveal no duties ascribed to the Operational Review Sergeant to manage or coordinate medical personnel assignment or shifts at the Duncan Unit or anywhere within TDCJ. In his Opposition, Plaintiff argues that Defendants are "claiming that medical care is not a department of a unit." *See* Opposition at 6 (PageID #468). However, the Smith Affidavit simply states that the job of Operational Review Sergeant does not have oversight or responsibility over medical personnel assignments or shifts. Plaintiff also argues that TDCJ, not UTMB, is responsible to provide medical care 24-hours, (7) seven days a week." *Id*. However, that is a conclusory statement unsupported by any actual fact. *Stults*, 76 F.3d at 655 (conclusory statements unacceptable to support summary judgment arguments). Moreover, even if TDCJ were responsible, as Plaintiff suggests, for "7/24" medical service, that does not mean that it is the job of the Operational Review Sergeant to manage the presence of medical personnel. In fact, the exhibits Defendants have provided show that it is not. Further, Plaintiff's own summary judgment evidence supports a finding that medical personnel assignments and shift hours are approved by TDCJ and UTMB at the organizational level, not by individual officers such as Defendant Smith. *See* Pltf Declaration in Support of PMSJ at Ex. 19 (response to Plaintiff's Step 1 grievance submitted June 21, 2010, and returned July 28, 2010, states "The approved hours of operation for the medical department at the Duncan Unit are 6:00 am to 6:[00] pm seven (7) days a week. The schedule is approved by TDCJ and UTMB.").

Furthermore, although Plaintiff asserts that Defendant Smith is responsible for training security personnel, *see* Pltf Declaration in Support of PMSJ at 4, ¶ 28 & Ex. 20 thereto, that again is a conclusory statement. Although his handwritten duplicate of the Health Care Manual Policy and Procedure section C.20.1 at Ex. 20 to his declaration states "All correctional officers will receive training that includes at least the following areas . . . first aid, recognizing the need for emergency

care . . . ," it does not state that the Operational Review Sergeant is responsible for providing such training.  Further, neither do the regulatory documents at the DMSJ Ex. H, I and J that establish the duties and responsibilities of the Operational Review Sergeant.[3]

Plaintiff has not established a genuine dispute as to Defendants' argument regarding Defendant Smith, nor does his own summary judgment evidence support a finding in his favor in light of the Defendants' evidence.  Therefore, Defendants are entitled to summary judgment with regard to Defendant Smith.

Similarly, Defendant Tobias submitted a sworn affidavit stating that at all times relevant to this lawsuit, she was the Alternate Unit Safety Officer for the Duncan Unit.  *See* DMSJ Ex. E. Defendants also submit excerpts from TDCJ's Post Order - AD-10.20 Officer (PO-07.099) (DMSJ Ex. K) and RM-16 Alternate Unit Risk Manager (DMSJ Ex. L).  As Defendant Tobias states in her affidavit, her duty at the time of the incident was to inspect "work areas and activities for hazards; and assisting in investigating accidents."  *See* Tobias Aff., DMSJ Ex. E at 2.  In that regard, she did "walk through inspections of Duncan Unit several times a month . . . I check for any structural deficiencies such as loose screws, broken toilets (toilets that do not flush or running toilets), uncovered outlets, lockers not working, etc. . . If I find something that is unsafe or it is brought to my attention, then I inform the maintenance department through a AD 84 'Inspection Log' of the issue and then maintenance address[es] it."  *Id*.  She added, "However, if it is a major work order then it must be approved through the TDCJ Administration in Huntsville, Texas."  *Id*.

---

[3]     Although the parties do not so state, it further appears to the Court that such training would necessarily be provided by medical personnel themselves.  However, absent evidentiary support for that supposition in any motion now before the Court, it does not form part of the basis for the Court's decision here.

Defendant Tobias stated that "the bunks at the Duncan Unit are not unsafe." *Id.* While that statement alone might be considered conclusory, she further states,

> As the safety officer, I did not receive any complaints from Mr. Guzman or any other offender concerning the safety of the bunks. Also, as the safety officer, it is to the best of my knowledge that there has not been any injuries due to the bunks being unsafe. Furthermore, during my walk through I did not see anything wrong or unsafe about the bunks. There was not a substantial risk to Mr. Guzman's safety that I recklessly disregarded.

*See id.* In fact, none of the grievances or I-60s attached to Plaintiff's complaint or his Plaintiff's Motion for Summary Judgment are addressed to Defendant Tobias, nor do they even mention her except for one grievance filed after Plaintiff's accident. *See* Pltf Declaration in Support of PMSJ, Ex. 15 (PageID #550) (naming same Defendants originally sued in this lawsuit). Additionally, it is clear that there already was a plan to install ladders on the bunks, which was related to Plaintiff in the responses to his grievances. *See* Complaint at PageID #8 (response to Step 2 grievance, stating "Records indicate your bunk assignment was appropriate. Furthermore, ladders will be installed as parts and scheduling permit."); Pltf Declaration in Support of PMSJ at Ex. 15 (PageID #440) ("You were appropriately housed. A work [order] has been submitted for ladders prior to your grievance," dated June 14, 2010, and signed by Warden Janie Cockrell); and Ex. 16 (PageID #442) (same).

Plaintiff also complains that Defendant Tobias failed to prohibit offenders such as him from being assigned to top bunks. Defendant Tobias addresses this in her affidavit as well:

> I do not have control over who is assigned to the top bunk versus the bottom bunk. The decision of who is assigned to what bunk is made by medical staff. At no time relevant to this lawsuit was I medical personnel. Even though the Duncan Unit is a geriatric unit, there are many offenders who are capable of using the top bunk. Mr. Guzman was assigned to the top bunk from medical, not by myself[.]

*See* Tobias Aff., DMSJ Ex. E at 2-3. This is affirmed in two ways. First, her job and duty descriptions at DMSJ Exs. K and L do not include either medical or classification duties with regard

to inmate housing or bunk assignments. Second, the expert medical report by Dr. Bowers, DMSJ Ex. C, includes a detailed explanation of Plaintiff's bunk assignment. Dr. Bowers noted that while Plaintiff was assigned to the Ware Unit on January 15, 2010, he underwent a physical examination with a written report. *See id*. at 2 (PageID #335). The only abnormal findings were that Plaintiff wore glasses; had a few small hemorrhoids; and had a history of depression. *Id*. As a result, a HSM-19 Health Classification form was generated "indicating that Mr. Guzman did not need any medical restrictions." *Id*. Specifically, there was no indication of any ankle fracture or that Plaintiff was experiencing any ankle problems, *id*., which is the actual genesis of his request for a bottom bunk, not that he was a "geriatric inmate" who could not climb into a top bunk. *See* Pltf Declaration in Support of PMSJ at Ex. 3 (PageID #422) (requesting bottom bunk assignment because "I have an old fractured lower leg" such that "I am afraid to have to 'jump down' and risk breaking, twisting or rehurting it in any way." Plaintiff also stated that he "use[d] the table to climb up and down. . . ." There is no mention of age-related concerns or limitations). Dr. Bowers continued, relating that on March 19, 2010, in response to Plaintiff's request for a sick call on the issue of his ankle and a bunk assignment, he was examined and the physician noted no blood pressure issues, no chronic care issues, no malaise, no distress, normal vital signs without medication, and no functional impairment was noted, specifically including no notation as to ankle complaints in the record. DMSJ Ex. C at 2. Therefore, no changes in Plaintiff's restrictions were made, including no restriction as to a bottom bunk only. *Id*. From then until Plaintiff's accident on May 14, 2010, he made no further complaints about his ankle or bunk assignment. *Id*.

At the time of Plaintiff's accident, as Dr. Bowers continues, even Plaintiff's ankle was not implicated in his injury. *Id*. He simply slipped as he was getting up into the bunk and fell back

toward the floor. *Id*. Citing the TDCJ *Correctional Managed Health Care Policy A-08-4, Attachment A, Guidelines for Completing the Health Summary for Classification Form, II. Housing Assignments, B. Bunk Assignment*, Dr. Bowers notes that the classification guidelines and the lack of any restrictions based on the March 19, 2010, physical examination led to his professional medical opinion that Plaintiff did not qualify for a lower bunk restriction. *Id*. Furthermore, Dr. Bowers opines that "the fall and injuries sustained by Mr. Guzman were no more than an accident and had nothing to do with Mr. Guzman's physical abilities or age." *Id*.

Based on that finding, Alternate Unit Safety Officer Tobias could not have been deliberately indifferent toward Plaintiff's need for a bottom bunk. First, he was cleared medically for assignment to a top bunk and was therefore appropriately classified, a function outside Defendant Tobias' duties; second, his injury was not related to being a "geriatric inmate" as he now claims, but was simply an accident. *See also* Pltf Declaration in Support of PMSJ, Ex. 5 (PageID #426-28) (Supervisor's Investigation of Employee/Offender Injury prepared and signed by Lt. McNight on May 15, 2010, stating "No Unsafe Condition" and that the accident was caused by Plaintiff being "Unobservant, Inattentive, Unaware").

Finally, Defendant Tobias raises the same issue as Defendant Smith regarding assignment of medical personnel to the Duncan Unit on a 24-hour basis. That is, it is outside her responsibility and a function of TDCJ/UTMB. For the same reasons discussed above, this argument applies equally to her.

Plaintiff has not established a genuine dispute as to Defendants' argument regarding Defendant Tobias, nor has his own summary judgment evidence support a finding in his favor in light of the Defendants' evidence. Therefore, Defendants are entitled to summary judgment with

regard to Defendant Tobias as well as Defendant Smith.

###    C.    Qualified Immunity

Defendants finally assert that they are entitled to qualified immunity from Plaintiff's claims. The defense of qualified immunity shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established rights which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982); *Wilson v. Layne*, 526 U.S. 603, 614, 119 S. Ct. 1692, 143 L. Ed. 2d 818 (1999). The doctrine of qualified immunity shields government officials "from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Fraire v. Arlington*, 957 F.2d 1268, 1273 (5th Cir. 1992), *citing Anderson v. Creighton*, 483 U.S. 635, 638, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987). The Supreme Court mandated a two-step sequence for resolving government officials' qualified immunity claims in *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). The Supreme Court held that courts are initially required to resolve a "threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry." *Id*. at 201. Second, if the Plaintiff has satisfied the first step, the court must decide whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct. *Id*. With respect to the second step, the Fifth Circuit has held that "a state actor is entitled to qualified immunity if his or her conduct was objectively reasonable in light of the legal rules that were clearly established at the time of his or her actions." *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002), *cert. denied*, 537 U.S. 1232, 123 S. Ct. 1355, 155 L. Ed. 2d 196 (2003).

The Supreme Court more recently revisited *Saucier v. Katz* in *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009). The Court held that "experience supports our present determination that a mandatory, two-step rule for resolving all qualified immunity claims should not be retained." *Id.* at 234. The Court went on to hold that "while the sequence set forth in [*Saucier*] is often appropriate, it should no longer be regarded as mandatory. The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236. The Supreme Court noted that the *Saucier* procedure sometimes unnecessarily "results in a substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case." *Id.* at 236-37. It was further noted that courts are free to follow the *Saucier* procedure, but the decision "simply recognizes that those courts should have the discretion to decide whether that procedure is worthwhile in particular cases." *Id.* at 242. The Supreme Court went on to discuss the facts of the case and found that the defendants were entitled to qualified immunity because the officers' conduct did not violate clearly established law. *Id.* at 244.

Here, there is no question whether Plaintiff's rights to be free from deliberate indifference to his medical needs existed at the time of the incident on May 14, 2010. In whichever order the *Saucier* factors are considered, that point is clear.

The operational issue is whether Defendants' "actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Fraire*, 957 F.2d at 1273. Put another way, "do the facts alleged show the officer's conduct violated a constitutional right[?]" *Saucier*, 533 U.S. at 201. As discussed above, however, Plaintiff has not shown an Eight Amendment violation

20

for deliberate indifference. Therefore, this prong of *Saucier* mandates a finding of qualified immunity on Defendants' parts.

It is accordingly

**ORDERED** that Defendants' Motion for Summary Judgment (docket entry #60) is hereby **GRANTED**. It is further

**ORDERED** that Plaintiff's Motion for Summary Judgment (docket entries #65-68) is hereby **DENIED**. It is further

**ORDERED** that Plaintiff's complaint is hereby **DISMISSED WITH PREJUDICE**. Plaintiff shall take nothing as a result of this lawsuit. It is further

**ORDERED** that the parties are to bear their own costs and fees. It is finally

**ORDERED** that any motion not previously ruled on, including but not limited to Plaintiff's Motion for Discovery (docket entry #71), is hereby **DENIED**.

So **ORDERED** and **SIGNED** this **30** day of **August, 2012.**

_____
JUDITH K. GUTHRIE
UNITED STATES MAGISTRATE JUDGE